350 S.E.2d 541

**CHILD PROTECTION GROUP, an unincorporated association; Goldie Goodrich, in her capacity as president of the Child Protection Group; Veronica McCune, in her capacity as vice president of the Child Protection Group; Carolyn Miller, in her capacity as secretary of the Child Protection Group; and Rita Cottrill, in her capacity as treasurer of the Child Protection Group,**

v.

**Danny O. CLINE, in his capacity as Judge in the 14th Judicial Circuit of the State of West Virginia; the Board of Education of Gilmer County, West Virginia, a statutory corporation of the State of West Virginia; Robert H. Hardman, in his capacity as superin-**

tendent of the Gilmer County Board of Education and in his capacity as secretary and custodian of the public records for the Gilmer County Board of Education; and Jeanne Kennedy, in her capacity as president of the Gilmer County Board of Education.

No. 17296.

Supreme Court of Appeals of West Virginia.

Submitted Sept. 9, 1986.

Decided Nov. 12, 1986.

Michael Farber, Sutton, for appellants.

No appearance for appellees.

BROTHERTON, Justice:

This is an original action in mandamus by the petitioners, Child Protection Group, an unincorporated association made up of parents whose children ride a school bus driven by Garland Roberts, against the respondents, Gilmer County Board of Education. The petitioners are seeking the release of the medical records of Garland Roberts, which are in the possession of the school board, under the West Virginia Freedom of Information Act, W.Va.Code §§ 29B–1–1 to 6 (1980). We hold for the petitioners and grant a restricted access to the records.

This action is a result of an incident which occurred during the course of a school bus run in January of 1986. According to the eyewitness accounts of the children on the bus, Garland Roberts unexpectedly stopped the vehicle while en route with a full load of children, whose ages ranged from six to eighteen, and began to lecture the children on religion. For approximately fifteen minutes, Mr. Roberts made statements such as: "the world was coming to an end;" "the Easter bunny was Satan;" and that the children were "bound for hell." Also of concern to the petitioners was that before the children had boarded the bus that day, Mr. Roberts was observed "fooling around" with the brakes on the school bus. Mr. Roberts also assured the children that in the event of an emergency he would "protect them from any harm."

As a result of the above-related events, Mr. Roberts was immediately suspended from his job by the Board of Education and was advised to seek medical treatment.

In May of 1986, Mr. Roberts was reinstated by the Board of Education to his former position. At that time, the Superintendent of Gilmer County Schools sent a letter to the parents of school children assuring that Mr. Roberts was capable of providing a safe means of transportation for the students. Also included in the letter were quotes from various physicians regarding Mr. Roberts' ability to return to work. The quotes were somewhat ambiguous and less than totally reassuring to the parents. For example, one quote stated: "As long as Mr. Roberts complies with the recommended medical regimen, it is not likely that his disorder will interfere with his work performance." With language such as "[a]s long as" and "not likely," it is easy to see the petitioning parents' concern.

The petitioners, acting as a newly formed parents group, refused to place their children on the school bus operated by Mr. Roberts.

On June 11, 1986, after repeated attempts to gain additional information from the Board, the petitioners initiated this proceeding under the West Virginia Freedom of Information Act for the stated purpose of confirming the nature of Mr. Roberts' mental problems.

I.

The Freedom of Information Act, Chapter 29B of the West Virginia Code, provides for the release of all public records unless the case falls into an exception. The clause which would control this case is W.Va.Code § 29B–1–4(2) (1980):

Information of a personal nature such as that kept in a personal, medical or similar file, if the public disclosure thereof would constitute an unreasonable invasion of privacy, unless the public interest by clear and convincing evidence requires disclosure in the particular instance. . . .

As the last sentence shows, a court, in deciding whether to release an individual's medical records, must balance the public's need to know against the individual's right

to privacy.[1] *See* syl. pt. 7, *Hechler v. Casey*, 175 W.Va. 434, 333 S.E.2d 799 (1985).

## II.

■ In deciding whether the public disclosure of information of a personal nature would constitute an unreasonable invasion of privacy, this Court now adopts a five factor test:

1. Whether disclosure would result in a substantial invasion of privacy and, if so, how serious? *See, e.g., Tennessean Newspapers, Inc. v. Levi*, 403 F.Supp. 1318, 1320–21 (M.D.Tenn.1975).

2. The extent or value of the public interest, and the purpose or object of the individuals seeking disclosure. *See, e.g., Campbell v. United States Civil Service Comm'n*, 539 F.2d 58, 61 (10th Cir.1976).

3. Whether the information is available from other sources. *See e.g., Wooster Republican Printing Co. v. City of Wooster*, 10 O.O.3d 312, 56 Ohio St.2d 126, 135, 383 N.E.2d 124, 129 (1978).

4. Whether the information was given with an expectation of confidentiality. *See e.g., Judiciary Committee v. Freedom of Information Commission*, 39 Conn.Sup. 176, 473 A.2d 1248, 1254 (1983).

5. Whether it is possible to mould relief so as to limit the invasion of individual privacy. *See generally Rural Housing Alliance v. United States Dept. of Agriculture*, 498 F.2d 73, 78 (D.C. Cir.1974).

The importance of these five factors requires a deeper understanding than is provided by their simple enunciation. We, therefore, expound on each factor individually.

■ First, the court must determine whether disclosure would result in an invasion of privacy and, if so, how serious. This is a two-part test. The first part is whether there is a substantial invasion of privacy. Private information is something which affects or belongs to private individuals as distinct from the public generally. *See Black's Law Dictionary* 1076 (5th ed. 1979). The invasion into the private information must be substantial. Information of a non-intimate or public nature may be disclosed. *See generally, Hechler v. Casey*, 175 W.Va. 434, 333 S.E.2d 799, 810 (1985).

■ If there is a substantial invasion of privacy involved, the court must measure the seriousness of the invasion. The right of privacy is relative to the customs of the time and place, and is determined by the norm of the ordinary man. *See Restatement (Second) of Torts* § 652D, Comment C (1977). Therefore, weighing the extent of the invasion of privacy, courts must look at the extent to which the release of the information would cause an ordinary man in the time and place of the private individual involved, embarrassment or harm. Unfortunately, courts have found this to be a particularly difficult test which has eluded attempts to be nailed down specifically. Courts have tried lists of "private" matters and other tests to attempt to separate the "deeply private" from the minimally private.[2] One court, venting its frustration at the balancing test, noted " '[b]alancing' tests ... are frequently of little analytical value. No method exists to determine the 'weight' given the factors to be balanced. Thus the court, without an objective measure to weigh competing interests, must substitute its subjective judgment...." *Hubert v. Harte-Hanks Texas Newspapers, Inc.*, 652 S.W.2d 546, 550 n. 7 (Tex.Ct. App.1983). While we recognize the faults of a system which requires the trial court to weigh subjective factors, we are resolved that there is no alternative. We are not able to state concisely what information would be embarrassing or harmful to the ordinary person under any given circumstance or how severe the embarrassment would be. Instead, we must look to

---

1. Note that most areas of the Freedom of Information Act allow no balancing. However, records containing personal information are exceptions to this rule. *See, e.g., Getman v. N.L.R.B.*, 450 F.2d 670, 674 n. 10 (D.C. Cir.1971).

2. For an excellent summary of these efforts, see *Providence Journal Co. v. F.B.I.*, 460 F.Supp. 778, 784–86 (D.R.I.1978), *rev'd on other grounds*, 602 F.2d 1010 (1st Cir.1979), *cert. denied*, 444 U.S. 1071, 100 S.Ct. 1015, 62 L.Ed.2d 752 (1980).

the trial judge, and his wisdom concerning the nature of people to resolve these issues, and we will allow some discretion in his decision.

Second, the court looks for the extent or value of the public interest, purpose or object of the individuals seeking disclosure. Again, this is two tests. The first is the value of the public interest. The interest may be pecuniary, or the public may have an interest because their legal rights or liabilities are affected. It does not mean anything so narrow as mere curiosity.[3]

The second test also concerns the purpose for which the information is sought. If the information is sought to provide for something which would be useful to the public, then the courts will weigh this favorably. *See, e.g., Deering Milliken, Inc. v. Irving,* 548 F.2d 1131 (4th Cir.1977). To the contrary, where a misuse of information may result, the courts are wary of ordering disclosure. *See Providence Journal Co., supra,* 460 F.Supp. at 789.

Third, the court asks whether the information is available from other sources. If the information sought is available in publicly obtainable books and records, then the court should simply allow the plaintiff access to information which he would eventually get anyway. If the information sought is available in a format which would be less intrusive to individual privacy, the courts should protect the privacy interests and force the plaintiff to use the less intrusive format.[4] Finally, if there is absolutely no other place or method to gather the information than from the particular Freedom of Information Act request before the court, this is a factor in favor of disclosure. *See, e.g., Getman v. N.L.R.B.,* 450 F.2d 670, 676–77 (D.C. Cir.1971).

Fourth, the court examines whether the information was given with an expectation of confidentiality. Often in the course of its duties a government agency will receive information of a very personal nature which was given with a legitimate expectation that this information would be kept private. *See, e.g., Columbia Packing Co. v. United States Dept. of Agriculture,* 417 F.Supp. 651, 654 (D.Mass.1976), *aff'd,* 563 F.2d 495 (1st Cir.1977). Government should keep its reasonable promises. If an agency consistently releases its private information, then people will be reluctant to surrender information to it. This may interfere with the agency's ability to exercise its duties. Further, our sense of morality tells us that government shouldn't be a gossip, telling private secrets given with an expectation of confidentiality unless there is some overridingly important reason.[5]

Finally, a court must ask whether it is possible to mould relief to limit the invasion of individual privacy. To release or not to release is not an "all or nothing" decision under the Freedom of Information Act where personal material is concerned. *See Braun v. City of Taft,* 154 Cal.App.3d 332, 341, 201 Cal.Rptr. 654, 659 (1984). The courts have consistently taken steps such as the deletion of certain personal data from the documents to be released so as to protect the privacy interests of individuals involved. *See, e.g., Department of Air Force v. Rose,* 425 U.S. 352, 375, 96 S.Ct. 1592, 1605, 48 L.Ed.2d 11 (1976). Trial courts should be encouraged to take innovative measures to limit the invasion of individual privacy whenever disclosure is required.

A court must also take into account the difference between state and federal law. Many of the citations in this opinion are to federal cases interpreting 5 U.S.C.

---

**3.** The public interest which has received the greatest protection is the interest in honest and efficient government. *See Providence Journal Co. v. F.B.I.,* 460 F.Supp. 778, 787 (D.R.I.1978), *rev'd on other grounds,* 602 F.2d 1010 (1st Cir. 1979), *cert. denied,* 444 U.S. 1071, 100 S.Ct. 1015, 62 L.Ed.2d 752 (1980).

**4.** An example of this case would be where information on a group was wanted for research

purposes. There would be no reason to let researchers have access to individual files if all the information they needed was contained in compilations.

**5.** An agreement or expectation of confidentiality, while a factor, will not override the Freedom of Information Act. *See Hechler v. Casey,* 175 W.Va. 434, 333 S.E.2d 799, 809 (1985).

§ 552(b)(6) (1982), a statute similar [6] to our W.Va.Code § 29B-1-4(2) (1980). It must be kept in mind, however, that the statutes differ in an important regard. Under the United States Code, private information should be disclosed unless its disclosure would "constitute a clearly unwarranted invasion of personal privacy." The West Virginia Code, on the other hand, exempts disclosure if the "public disclosure thereof would constitute an unreasonable invasion of privacy, unless the public interest by clear and convincing evidence requires disclosure in the particular instance." While the burden of proof is always on the agency resisting disclosure, the burden is different in the two codes. The Federal Code unambiguously favors disclosure of personal information [7] with the resisting party having to show clear evidence of an unwarranted invasion of personal privacy. The West Virginia Code, with some ambiguity, [8] favors nondisclosure of personal information unless public interest clearly requires disclosure. The simplest explanation of these differences is as follows: If the scales weigh heavily in favor of disclosure, both codes require disclosure; if the scales weigh heavily in favor of nondisclosure, both codes require nondisclosure; but, if the scales weigh even or near even, the Federal Code favors disclosure while the West Virginia Code favors nondisclosure.

### III.

■ With these factors in mind, we turn to the facts of this case. The scales weigh heavy on both sides with some factors weighing for Mr. Roberts and some for the parents. There is no question that disclosure would cause an invasion of privacy.

An individual's medical records are classically a private interest. Further, it is difficult to imagine an item more potentially embarrassing than individual psychiatric reports. These reports often contain confessions that were meant only for the ears of the psychiatrists. They also contain the psychiatrists' notes as to the well being of the patient's mind. No individual would want these matters to be considered a public record. These reports were surrendered to the school board under a justifiable expectation of confidentiality. Further, the trial court, in its discretion, ruled for Mr. Roberts. Certainly only a most compelling interest could justify the release of the records under the Freedom of Information Act.

Nevertheless, we believe that the parents of the children assigned to Mr. Roberts' bus have such a compelling interest in his mental condition. Mr. Roberts' statements and actions in front of the children raise serious concerns about his ability to safely pilot his school bus. The parents' fears that Mr. Roberts may attempt an early rapture of the school bus and its occupants are not without justification. In order to make an informed decision as to whether or not to allow Mr. Roberts to drive their children to school, the parents need more than short, ambiguous quotes from his psychiatrists. The parents deserve to see all of the evidence on Mr. Roberts' condition. The information is available only from this request.

The safety of school children is always of great importance to this Court. *See generally State ex rel. Hughes v. Board of Educ.*, 154 W.Va. 107, 118-19, 174 S.E.2d 711, 718 (1970), *overruled on other*

---

**6.** The exemptions in W.Va.Code § 29B-1-4 are similar to those in the Federal Freedom of Information Act. *See Sattler v. Holliday*, 173 W.Va. 171, 318 S.E.2d 50 (1984).

**7.** *See Getman v. N.L.R.B.*, 450 F.2d 670, 674 & n. 11 (D.C. Cir.1971). The stated "instructs the court to tilt the balance in favor of disclosure."

**8.** The ambiguity is that the West Virginia Code requires a balancing test when there has been a "unreasonable" invasion of privacy. The legislature obviously intended "unreasonable" to be a trigger which would invoke § 29B-1-4(2) pro-

tections. The legislature recognized that certain information about individuals is routinely disclosed as public record and does not rise to such a level that a balancing test need be applied. For example, records of births and deaths, marriages, land sales and other routine, relatively innocuous items, may be disclosed by government without having to resort to a balancing test with each item. By "unreasonable" the legislature means a "substantial" invasion of privacy, i.e., more than what the average person would normally expect the government to disclose about him.

grounds in *Janasiewicz v. Board of Educ.*, 171 W.Va. 423, 299 S.E.2d 34 (1982). In this case it is the safety of the children which we find to be a factor of overriding importance, tipping the scales clearly and convincingly toward disclosure. We, therefore, hold that the trial court abused its discretion in not allowing at least a limited access to the records.

We now turn our attention to trying to limit the damage we have done to Mr. Roberts. In order to dilute what is a massive invasion of Mr. Roberts' privacy, we take the somewhat unprecedented step of ordering a less than full disclosure of the records, limiting their viewing only to those who have a "need to know."[9] The public at large has no need to know about Mr. Roberts' medical condition. Mr. Roberts does not make decisions in his job which will affect anyone other than those riding his bus. He is not a high elected official, but a humble public servant. No public interest would be served by a general release of Mr. Roberts' records. Therefore, we hold that the public at large does not meet the test set out in § 29B-1-4(2) and the public at large should not be allowed to view Mr. Roberts' medical reports.

In order to best fit the equities of this unusual case, we therefore fashion the following remedy. (1) All relevant information in Mr. Roberts' personnel and medical files shall be open to inspection by any parent whose child is assigned to Mr. Roberts' bus. The records shall be kept in a convenient place and open to inspection during normal business hours. The parents, however, shall not be allowed to photocopy any records. (2) In the event the parents collectively or any one of them wish to investigate the possibility of legal action in this regard, their attorney shall be allowed one complete photocopy of Mr. Roberts' records. Such attorney may disseminate this information further to persons in his employ, an officer of the court, or a medical expert. (3) No general public dissemination of this information should be

allowed without the permission of Mr. Roberts and the Board of Education of Gilmer County.

We, therefore, grant the writ of mandamus of the petitioners in this case, as moulded, so as to provide the relief stated above.

Writ granted as moulded.

---

9. Most courts trying to limit the invasion of personal privacy caused by the release of private information have limited themselves to the deletion of the private material. *See e.g., Prov-idence Journal Co. v. F.B.I.*, 460 F.Supp. 778, 789 (D.R.I. 1978). Unfortunately, that was not possible in this case.