# IN THE INTERMEDIATE COURT OF APPEALS OF WEST VIRGINIA

Spring 2024 Term

_____

No. 23-ICA-283

_____

FILED

**May 23, 2024**

released at 3:00 p.m.
ASHLEY N. DEEM, DEPUTY CLERK
INTERMEDIATE COURT OF APPEALS
OF WEST VIRGINIA

GRAY MEDIA GROUP, INC., d/b/a WSAZ,
Plaintiff Below, Petitioner,

v.

WEST VIRGINIA DEPARTMENT OF HEALTH AND HUMAN RESOURCES,
Defendant Below, Respondent.

_____

Appeal from the Circuit Court of Kanawha County
Honorable Kenneth D. Ballard, Judge
Civil Action No. 22-P-197

REVERSED AND REMANDED
_____

Submitted:  April 16, 2024
Filed:  May 23, 2024

Matthew S.L. Cate, Esq.
Charles D. Tobin, Esq.
Ballard Spahr LLP
Washington, D.C.
*Pro Hac Vice*


Erica M. Baumgras, Esq.
Flaherty Sensabaugh & Bonasso PLLC
Charleston, WV
Counsel for Petitioner

Patrick Morrisey, Esq.
Attorney General
Lindsay S. See, Esq.
Solicitor General
Michael R. Williams
Principal Deputy Solicitor General
Spencer J. Davenport
Assistant Solicitor General
Charleston, WV
Counsel for Respondent

CHIEF JUDGE SCARR delivered the Opinion of the Court.

SCARR, CHIEF JUDGE:

Gray Media Group, d/b/a WSAZ ("WSAZ"), operates a television station headquartered in Huntington, West Virginia, with an additional studio and newsroom in Charleston, West Virginia. WSAZ appeals from two Orders entered by the Circuit Court of Kanawha County on March 31, 2023, and May 31, 2023. These orders held, in part, that the West Virginia Department of Health and Human Resources ("Department") was not required to disclose an April 2022 termination letter from William Crouch (Secretary of the Department) to Jeremiah Samples (Deputy Secretary) in response to a Freedom of Information Act ("FOIA") request from WSAZ. The circuit court concluded that disclosure would constitute an unreasonable invasion of privacy and the letter was therefore exempt from disclosure under West Virginia Code § 29B-1-4(a)(2) (2021). We reverse and remand for further proceedings consistent with this opinion.

## I. FACTUAL AND PROCEDURAL BACKGROUND

In early April 2022, the Department fired its Deputy Secretary, Jeremiah Samples, during a period of intense scrutiny regarding the Department's operations. The Legislature had recently passed legislation, vetoed by the governor, which would have split the Department into two agencies because of concerns that it had grown too large, unwieldy, and inefficient. Mr. Samples' firing prompted substantial news coverage and was

1

discussed publicly by lawmakers, Samples, and the agency official who fired him.[1] In fact, one news outlet described his termination as the "political news of the week." *See* Joe Severino, *Will Samples' Exit Be a Beginning or an End?*; Charleston Gazette-Mail (April 12, 2022); Appendix ("App.") at 114.

Following the termination of his employment, Mr. Samples issued a public statement explaining that "DHHR has struggled to make, and even lost, progress in many critical areas."[2] Specifically, he noted that "[c]hild welfare, substance use disorder, protection of the vulnerable, management of state health facilities, EMS and provider capacity, supporting client transition from public assistance to the workforce, contract management, and many more DHHR responsibilities have simply not met anyone's expectation, especially my own." He also alluded to differences with Secretary Crouch

---

[1] According to one source, the termination of Mr. Samples was "an example of the dysfunction within DHHR." *See* Brad McElhinny, *DHHR Deputy's Abrupt Departure is a Lightening Rod Over Broader Agency Issues*, MetroNews (April 11, 2022) (quoting Delegate Dianna Graves from Kanawha County) ("McElhinny"); App. at 117. There was also some concern that Governor Jim Justice might have been "blindsided" by the termination of Mr. Samples. *See id.* (quoting Senate Finance Chairman Eric Tarr); App. at 118. Lawmakers said that Mr. Samples "will be missed" and that his departure from the Department was a "huge loss" and "incalculable." McElhinny; App. at 119-21, McElhinny, *Outgoing DHHR Deputy Cites Differences With Crouch, Challenges of Agency,* MetroNews (April 11, 2022); App. at 129.

[2] The full text of Mr. Samples' public statement concerning his departure from the Department was published by WSAZ on April 11, 2022, and appears at App. at 124.

regarding these problems, stating that "Secretary Crouch and I have not shared the same views on what the problems are, how to handle them, or the urgency of achieving results."[3]

When WSAZ learned of the firing, its Assistant News Director submitted a two-part FOIA request to the Department seeking (1) copies of all communications and documentation regarding the resignation or termination of Jeremiah Samples and (2) all email communications between Mr. Samples and Secretary Crouch between December 1, 2021, and April 7, 2022. WSAZ claims it sought the records

> because there is a compelling public interest in the circumstances of the termination of the second-in-command of a state agency that has long been under legislative scrutiny as it oversees the state's response to the COVID-19 pandemic, government-assistance programs, and other matters that directly affect the well-being of the citizens of this state.

The Department initially refused to produce any records in response to the request on the grounds that "any responsive records in our possession are exempt from disclosure pursuant to West Virginia Code § 29B-1-4(a)(2) and West Virginia Code § 29B-1-4(a)(8)," which led WSAZ to file the underlying "Complaint for Declaratory and Injunctive Relief Pursuant to the West Virginia Freedom of Information Act" on May 31, 2022. In addition to declaratory and injunctive relief, WSAZ sought attorney fees pursuant

---

[3] Although Mr. Samples did not specify the nature of his disagreement with the Secretary of the Department, it was publicly reported that "Crouch had vehemently opposed splitting DHHR into two separate agencies." Joe Severino, *Will Samples' Exit Be a Beginning or an End?* Charleston Gazette Mail (April 12, 2022); App. at 114.

3

to West Virginia Code § 29B-1-7 (1992).[4] The Department subsequently filed a motion to protect exempted documents while WSAZ filed a motion for partial summary judgment.

Ultimately, many of the public records responsive to WSAZ's request were disclosed, in whole or in part, because of the lawsuit. This appeal pertains to just one document – the April 2022 letter from William Crouch, then the Department's Secretary, notifying Mr. Samples of his termination and explaining the reasons for the decision. The Department asserted that the letter was exempt from disclosure under W. Va. Code § 29B-1-4(a)(2) because it was "information of a personal nature" whose disclosure "would constitute an unreasonable invasion of privacy."[5] The circuit court ordered the Department to provide it with a copy of the letter for in camera review.

---

[4] FOIA's fee shifting provision provides:

> Any person who is denied access to public records requested pursuant to this article and who successfully brings a suit filed pursuant to section five of this article shall be entitled to recover his or her attorney fees and court costs from the public body that denied him or her access to the records.

W. Va. Code § 29B-1-7. WSAZ filed a request for attorney fees in the circuit court which is still pending. WSAZ is also seeking to recover its attorney fees and costs associated with this appeal.

[5] The Department also initially claimed that the letter fell under FOIA's "internal memoranda" exemption, *see* W. Va. Code § 29B-1-4(a)(8), but later withdrew that argument, acknowledging that the final version of the letter was not covered by this exemption. In order to qualify as an "internal memorandum" a document must be both predecisional and deliberative. Syl. Pt. 5, *Highland Min. Co. v. WVU Sch. Of Med.*, 235 W. Va. 370, 774 S.E.2d 36 (2015).

On December 14, 2022, the circuit court appointed R. Scott Long, Esq. as Special Commissioner to review in camera all withheld records at issue, including Mr. Samples' termination letter, and to determine whether they were exempt from disclosure under FOIA. On January 18, 2023, Special Commissioner Long issued his recommendations, finding, among other things, that the termination letter was not subject to disclosure because it was covered by the FOIA exemptions for internal memoranda and personal information. On January 25, WSAZ filed its objections to the recommended decision. On March 9, 2023, the parties appeared for a hearing on the objections.

By order dated March 31, 2023, the circuit court ruled that the termination letter was protected from disclosure under the invasion of privacy exemption of FOIA. This exemption contained in West Virginia Code § 29B-1-4(a)(2) provides protection for:

> Information of a personal nature such as kept in a personal, medical, or similar file, if the public disclosure of the information would constitute an unreasonable invasion of privacy, unless the public interest by clear and convincing evidence requires disclosure in this particular instance . . .

Although the termination letter was deemed confidential and not subject to disclosure, the court found that WSAZ substantially prevailed as to the other FOIA requests and ordered the Department to pay costs related to Special Commissioner Long.

On May 31, 2023, the circuit court entered its "Final Order" ruling on some additional objections raised by WSAZ to the Special Commissioner's Amended Second

5

Recommended Decision, which related to thirty-four records that the Department withheld from disclosure, including the termination letter. The court referred to its prior order of March 31, 2023, that the letter is "personal confidential information protected from disclosure" and stated that this ruling remained "unchanged."

On July 10, 2023, the Department, by email, produced a group of records to WSAZ in compliance with the May 31, 2023, order currently on appeal. Inadvertently included in the production was an unredacted copy of an unsigned draft of the termination letter. In this draft letter, Secretary Crouch sharply criticized Mr. Samples' performance of his public duties and its adverse effect on the Department's integrity and function. Among other things, the draft:

- Advises Samples of Secretary Crouch's decision to immediately dismiss Samples as Deputy Secretary;
- Accuses Samples of conduct that "prevents or hinders the Department from meeting its objectives" in serving the public;
- Writes that he had repeatedly told Samples that communication between them "is critical to assure that the Department is moving in the right direction and fulfilling its role in the state;"
- States that despite these repeated admonitions, there had been "an ongoing and virtually total lack of communication and coordination regarding [Samples'] duties and responsibilities;"
- Asserts that Samples' failure to adequately communicate with Crouch "is misconduct and insubordination which prevents, or at the very least, delays the Department in fulfilling its mission;"
- Accuses Samples of having actively opposed Crouch's policy decisions and of trying to "circumvent those policy

6

decisions by pushing your own agenda," allegedly causing departmental "confusion" and resulting in "a slowdown in getting things accomplished in DHHR;"

- Notes that Samples had been told multiple times "to focus on child welfare," but "[r]ather than follow that directive, [Samples] chose to involve [himself] in all issues regarding DHHR wherever [he] saw fit," and "in many instances" had given directives that were in conflict with what Crouch had directed;
- Informs Samples that his behavior violated the Department's official written policy governing employee conduct; and
- Concludes that Samples' termination was necessary "to maintain the Department's integrity, which provides its employees with a means to ensure its efficient and effective operation."

App. at 423-24.

When WSAZ notified the Department of the inadvertent disclosure of this draft letter, the Department moved for an order restraining WSAZ from disseminating the draft. The circuit court issued a temporary injunction, but after an August 23, 2023, hearing, it dissolved the temporary order and denied the Department's motion for a permanent restraining order. In its August 28, 2023, order denying the motion for a permanent restraint, the court concluded that once the Department sent the unredacted draft to WSAZ's counsel, WSAZ had a First Amendment right to publish the information absent a "state interest of the highest order." The court found no such interest and concluded that justice would not be served by restraining counsel for WSAZ from providing the draft letter to their client. Shortly after the circuit court's decision, WSAZ included the draft letter in

7

its news coverage, Pet'r Br. at 5, and published the draft letter online. *See* WSAZ, http://www.wsaz.com/2023/08/wsaz-obtains-dhhr...(August 28, 2023).

WSAZ now appeals the March 31, 2023, and May 31, 2023, orders which held that disclosure of the final version of the termination letter would result in an unreasonable invasion of privacy for Mr. Samples.[6]

## II.  STANDARD OF REVIEW

This Court reviews questions of law in FOIA appeals de novo. Syl. Pt. 2, *Tax Analysts v. Irby*, ___ W. Va. ___, 900 S.E.2d 37 (2024); *Charleston Gazette v. Smithers*, 232 W. Va. 449, 460, 752 S.E.2d 603, 614 (2013). The circuit court's underlying factual findings are reviewed under a clearly erroneous standard. *Associated Press v. Canterbury*, 224 W. Va. 708, 712, 688 S.E.2d 317, 321 (2009). It is not clear from the decisions of the Supreme Court of Appeals of West Virginia whether a circuit court's final order and ultimate disposition of a FOIA issue should be reviewed under a deferential abuse of discretion standard or a plenary de novo standard. *Compare In re Charleston Gazette FOIA Request*, 222 W. Va. 771, 775, 671 S.E.2d 776, 780 (2008) (per curiam*) (abuse of discretion); *Smith v. Bradley*, 223 W. Va. 286, 290, 673 S.E.2d 500, 504 (2007) (per curiam) (abuse of discretion); *and Child Prot. Grp. v. Cline*, 177 W. Va. 29, 33, 34, 35, 350 S.E.2d 541, 544, 546 (1986) (referring to the discretion of a trial court in deciding disclosure issues

---

[6] This Court held oral argument on April 16, 2024.

under the privacy exemption and holding that the trial court had abused its discretion in refusing to allow limited disclosure) *with Highland Min. Co. v. W. Va. U. Sch. of Med.*, 235 W. Va. 370, 380, 774 S.E.2d 36, 46 (2015) (de novo); Syl. Pt.1*, Farley v. Worley*, 215 W. Va. 412, 599 S.E.2d 835 (2004) (de novo); and Syl. Pt.1, *Charleston Gazette v. Smithers,* 232 W. Va. 449, 752 S.E.2d 603 (2013) (de novo). Under either standard, however, our ruling would be the same.

## III. DISCUSSION

This appeal involves an issue of first impression, whether the letter of termination of a high-ranking public official is subject to disclosure under FOIA. West Virginia's FOIA statute was enacted in 1977 for the purpose of "open[ing] the workings of government to the public so that the electorate may be informed and retain control." *Ogden Newspapers, Inc. v. City of Williamstown*, 192 W. Va. 648, 650, 453 S.E.2d 631, 633 (1994). The Declaration of Policy contained in the first section of this act states:

> Pursuant to the fundamental philosophy of the American constitutional form of representative government which holds to the principle that government is the servant of the people, and not the master of them, it is hereby declared to be the public policy of the State of West Virginia that all persons are, unless otherwise expressly provided by law, entitled to full and complete information regarding the affairs of government and the official acts of those who represent them as public officials and employees. The people, in delegating authority, do not give their public servants the right to decide what is good for the people to know and what is not good for them to know. The people insist on remaining informed so that they may retain control over the instruments of government they have created. To that end, the provisions of this article shall be liberally

9

> construed with the view of carrying out the above declaration
> of public policy.

W. Va. Code § 29B-1-1 (1977). "The general policy of this act is to allow as many public records as possible to be available to the public." *AT&T Commc'ns of W. Va., Inc. v. Pub. Serv. Comm'n of W. Va.*, 188 W. Va. 250, 253, 423 S.E.2d 859, 862 (1992). To give that policy effect, the FOIA provides a presumptive right of access to all documents that relate "to the conduct of the public's business." *See W. Va. Code* § 29B-1-2(5) (defining "public record"); W. Va. Code § 29B-1-3 (providing "a right to inspect or copy any public record"); W. Va. Code § 29B-1-4(a) (establishing "a presumption of public accessibility to all public records").

Consistent with this policy, under FOIA, "[t]here is a presumption of public accessibility to all public records, subject only to [certain] categories of information which are specifically exempt from disclosure [.]" W. Va. Code § 29B-1-4(a); *see also* W. Va. Code § 29B-1-3(a) ("[e]very person has a right to inspect or copy any public record of a public body in this state, except as otherwise expressly provided…"). [7] In applying FOIA, the statutory language must be liberally construed, while the exemptions to disclosure must be narrowly construed. Syl. Pt. 1, *Daily Gazette Co., Inc. v. W. Va. Develop. Office*, 198 W.

---

[7] There is no dispute that the Department is a "public body" or that the termination letter is a "public record" for purposes of FOIA. Similarly, there was no dispute at oral argument that the termination letter was contained in Mr. Samples' personnel file.

Va. 563, 482 S.E.2d 180 (1996); Syl. Pt. 4, *Hechler v. Casey*, 175 W. Va. 434, 333 S.E.2d 799 (1985).

"The party claiming [an] exemption from the general disclosure requirement under West Virginia Code § 29B-1-4 has the burden of showing the express applicability of such exemption to the material requested." Syl. Pt. 7, *Queen v. W. Va. Univ. Hosps., Inc.*, 179 W. Va. 95, 365 S.E.2d 375 (1987); *see also* W. Va. Code § 29B-1-5(2) (1977) (in actions seeking disclosure, "the burden is on the public body to sustain its action.").

The Department has claimed an exemption under West Virginia Code § 29B-1-4(a)(2) for "[i]nformation of a personal nature such as that kept in a personal, medical, or similar file, if the public disclosure of the information would constitute an unreasonable invasion of privacy, unless the public interest by clear and convincing evidence requires disclosure in this particular instance[.]" As the Department acknowledges, the mere fact that a document is contained in a personal file does not necessarily mean that it is protected from disclosure. *See In re Charleston Gazette FOIA Request*, 222 W. Va. 771, 671 S.E.2d 776 (2008) (per curiam) (disclosure of activity logs and payroll sheets of police officers accused of double dipping was required); *see generally Hechler v. Casey*, 175 W. Va. 434, 444, 333 S.E.2d 799, 809 (1985) ("The threshold inquiry as to the type of information initially subject to this exemption turns not upon the label of the file containing the information….").

11

Unlike the other exemptions contained in FOIA,[8] the personal information exemption, sometimes referred to as the "invasion of privacy exemption," requires courts to balance competing interests, the privacy interest of the person affected against the public interest in disclosure. *See* Syl. Pt. 1, *Child Prot. Grp. v. Cline*, 177 W. Va. 29, 350 S.E.2d 541 (1986); Syl. Pt. 7, *Hechler v. Casey*, 175 W. Va. 434, 333 S.E.2d 799 (1985) ("a court must balance or weigh the individual's right of privacy against the public's right to know").

> In deciding whether the public disclosure of information of a personal nature…would constitute an unreasonable invasion of privacy, [courts must] look to five factors:
>
> 1. Whether disclosure would result in a substantial invasion of privacy and, if so, how serious.
> 2. The extent or value of the public interest, and the purpose or object of the individuals seeking disclosure.
> 3. Whether the information is available from other sources.
> 4. Whether the information was given with an expectation of confidentiality.
> 5. Whether it is possible to mould relief so as to limit the invasion of individual privacy.

Syl. Pt. 2, *Child Prot. Group v. Cline*, 177 W. Va. 29, 350 S.E.2d 541 (1986). Applying this analysis in the present case, we conclude that the requested disclosure would not constitute an unreasonable invasion of privacy, and that disclosure is therefore required.

---

[8] As the Court observed in *Child Protection Group v. Cline*, 177 W. Va. 29, 32 n.1, 350 S.E.2d 541, 543 n.1 (1986), "most areas of the Freedom of Information Act allow no balancing. However, records containing personal information are exceptions to this rule."

## A. Privacy Interest

Given the circumstances of this case, the privacy interest in non-disclosure is limited at best, such that disclosure would be neither substantial nor serious. In reaching this conclusion, we have considered the nature of the information sought, the source of the information, the fact that the record sought is a final version rather than a draft, the position and rank of the public employee whose privacy interests are allegedly invaded, the effect of previous disclosures, and our own in camera review of the final version of the termination letter. The circuit court erred in failing to consider the various factors which diminished Mr. Samples' privacy interest and consequently gave too much weight to that interest.[9]

Initially, we note that the information sought does not involve sensitive personal, medical, or health information. Instead, it involves the operation of government and the performance of public duties by a public official.[10] As the Supreme Court of

---

[9] We recognize that Mr. Samples has some privacy interest, albeit greatly diminished, in the contents of his termination letter because of the possibility of embarrassment and damage to his personal and professional reputation and dignity. *See* Syl. Pt. 2, *Manns v. City of Charleston Police Dept.*, 209 W. Va. 620, 550 S.E.2d 598 (2001).

[10] Although we have focused on Mr. Samples, we recognize that information concerning his termination might also shed light on the actions of other public officials, including Secretary Crouch, who issued the termination letter, because it demonstrates how he justified and handled the dismissal of a high-ranking subordinate. *See* Brad McElhinny, *Outgoing DHHR Deputy Cites Differences with Crouch, Challenges of Agency*, MetroNews (April 11, 2022); App. at 129 (quoting Delegate Dianna Graves) ("When DHHR has an employee who works tirelessly, is brilliant and dedicated, could go elsewhere

13

Appeals of West Virginia has repeatedly held, "[t]he primary purpose of the invasion of privacy exemption to the Freedom of Information Act…is to protect individuals from the injury and embarrassment that can result from the unnecessary disclosure of **personal** information." Syl. Pt. 5, *Charleston Gazette v. Smithers,* 232 W. Va. 449, 752 S.E.2d 603 (2013) (emphasis added) (quoting Syl. Pt. 6, *Hechler v. Casey,* 175 W. Va. 434, 333 S.E.2d 799 (1985)). The conduct of public officials while performing their public duties was not the sort of information meant to be protected by FOIA. *See Charleston Gazette v. Smithers,* at Syl. Pt. 8 ("Conduct by a state police officer while the officer is on the job in his or her official capacity as a law enforcement officer and performing such duties, … does not fall within the West Virginia Freedom of Information Act invasion of privacy exemption set forth in West Virginia Code § 29B–1–4(a)(2) (2012)."); *see also Cowdery, Ecker & Murphy, LLC v. U.S. Dept. of Interior*, 511 F.Supp.2d 215, 219 (D. Conn. 2007) ( "Because exemption 6 seeks to protect government employees from unwarranted invasions of privacy, it makes sense that FOIA should protect an employee's personal information, but not information related to job function.").

Significantly, the termination letter was a record prepared by the government, instead of by concerned citizens who might be discouraged from sharing information with the government if their actions or statements were readily subject to disclosure. *See In re Charleston Gazette FOIA Request*, 222 W. Va. at 779, 671 S.E.2d at

and make so much more… and yet is fired for what amounts to a technicality, there is quite obviously a serious problem in leadership that needs to be addressed.").

14

784 (distinguishing the disclosure of confidential information by "third-party public citizens" from the disclosure of information provided "by public employees").

It is also relevant that the termination letter sought is a final version, rather than a draft. Public employees have a greater privacy interest in drafts than final versions of termination letters, performance evaluations, indictments, or other documents critical of their performance. Drafts may contain allegations that are never verified, adopted, or acted upon, and which the employee may never have a good opportunity to defend. *See Jud. Watch, Inc. v. Nat'l Archives and Records Admin.*, 876 F.3d 346, 349-50 (D.C. Cir. 2017) (emphasis added) (noting that Mrs. Clinton's privacy interest was "heightened in the context of a **draft** indictment" and that it was "difficult to imagine circumstances where a **draft** indictment could ever be disclosed without seriously infringing an individual's privacy interest"); *Bloomgarden v. DOJ*, 874 F.3d 757, 761 (D.C. Cir. 2017) ("The aspect of the [proposed termination] letter that concerns us the most is that it contains mere allegations; it was never tested, nor was it ever formally adopted by the deputy-attorney general's office."); *Charleston Gazette Co. v. Smithers*, 232 W. Va. 449, 469, 469 S.E.2d 603, 623 (2013) (emphasis added) ("the **premature** disclosure of information about any investigation into allegations of misconduct by state police officers before any internal investigation or inquiry takes place, could cause an unwarranted invasion of privacy.").

15

We also note the position of Mr. Samples, who shared the second highest rank in the Department.[11] As the Department itself acknowledges, see Resp't's Br. at 7, high ranking government officials have a lower expectation of privacy than low level functionaries.[12] Courts applying comparable provisions of the federal FOIA[13] have repeatedly held that public employees have reduced privacy interests in records relating to their performance—especially when the records relate to the conduct of high-ranking officials. *See Stern v. FBI*, 737 F.2d 84, 92 (D.C. Cir. 1984) ("censure letter" provided to high-ranking official was not exempt because the reduced privacy interests in the details of public employee performance is further diminished with increased level of responsibility, but information pertaining to disciplining of two low level FBI employees could be withheld); *see also, e.g.*, *Perlman v. DOJ*, 312 F.3d 100, 107 (2d Cir. 2002), (emphasizing "level of responsibility held by a federal employee" is an "appropriate consideration" in assessing extent of privacy interests at stake), *vacated by* 541 U.S. 970

---

[11] Mr. Samples was one of two Deputy Secretaries answering directly to the Secretary of the Department.

[12] The Supreme Court of Appeals of West Virginia has considered a public employee's position in resolving disclosure issues under FOIA. In *Child Prot. Grp. v. Cline*, 177 W. Va. 29, 35, 350 S.E.2d 541, 546 (1986) (emphasis added), the Court considered a bus driver's position in determining that only parents of students assigned to his bus should be allowed access to his medical records. In limiting disclosure, the court reasoned that: "The public at large has no need to know about Mr. Roberts' medical condition. Mr. Roberts does not make decisions in his job which will affect anyone other than those riding his bus. **He is not a high elected official, but a humble public servant."**

[13] The Supreme Court of Appeals has repeatedly held that federal FOIA cases are "highly persuasive" when construing similarly worded provisions of West Virginia's FOIA. *Farley v. Worley*, 215 W. Va. 412, 420 n.7, 599 S.E.2d 835, 843 n.7 (2004); *see also Daily Gazette Co., Inc., v. W. Va. Dev. Office*, 198 W. Va. 563, 571, 482 S.E.2d 180, 188 (1996).

16

(2004), *reinstated after remand*, 380 F.3d 110 (2d Cir. 2004) (per curiam); *Cowdery, Ecker & Murphy, LLC v. Dep't of Interior*, 511 F. Supp.2d 215, 218 (D. Conn. 2007) (fact that requested performance evaluations were of agency's "third in command" favored disclosure); *Sullivan v. Veterans Admin.*, 617 F. Supp. 258, 261 (D.D.C. 1985) (that government employees have diminished privacy interests in such records "is particularly true where, as here, the federal employee in question holds a high level position"); *Hardy v. DOD*, No. CV-99-523-TUC-FRZ, 2001 WL 34354945, at *9 (D. Ariz. Aug. 27, 2001) (finding agency director and associate director had "minimal" privacy interest in performance evaluations and ratings in large part due to their "high-level position[s]").

Mr. Samples' privacy interest in the final version of his termination letter has been significantly diminished by the disclosures which have already occurred in this case. *See generally* 37A Am. Jur. 2d *Freedom of Information Acts* §239, Westlaw (database updated February 2024) ("In an evaluation of the invasion of privacy rights threatened by a disclosure of requested information, an important consideration is the extent that access to the information has already been allowed and to what extent privacy interests have been eroded as a result."). The scope of Mr. Samples' privacy interest has been limited by the public statements concerning Mr. Samples' termination made by the Secretary of the Department, the governor, and Mr. Samples himself. Mr. Samples' statement concerning his termination has clearly waived any privacy interest he might have related to the fact of

17

his termination, and the fact that it resulted from a disagreement with the Secretary of the Department.[14]

The Department argues that the accidental release of the draft letter is irrelevant because the language of the final version of the letter may have been different from the draft. In response, WSAZ (which has never seen the final version) argues that it is entitled to obtain a copy of the final version of the letter regardless of whether it differs from the draft. If the language of the final version is substantially the same, then releasing the final version will not invade Mr. Samples' privacy more than it may have been compromised already by the release of the draft. On the other hand, if the language between the two versions significantly differs, then the public would have a strong interest in disclosure. Among other things, a difference in language between the two versions of the letter might raise questions regarding the real reasons for Mr. Samples' termination.

The Department, for its part, argues that the final version should not be disclosed, regardless of whether its language is identical to that of the draft or not. According to the Department, even if the language is the same, disclosing the final version would confirm the statements made in the draft, and that would constitute an invasion of privacy in itself. Regarding the termination letter, we find WSAZ's position more

---

[14] We recognize that a public statement by a discharged employee which merely confirmed the fact of termination would not necessarily eliminate any privacy concerns involving undisclosed details of that termination, such as the reasons for termination.

compelling, and place little weight on the Department's argument regarding confirmation. We also observe, without commenting on the language of the final version of the termination letter and whether it differs from the draft, that we have examined both the draft already disclosed and the final version (in camera) and that our review supports our ruling that the letter is subject to disclosure.

Having found no substantial or serious privacy interest, we might be able to end our analysis here, *see Child Prot. Grp. v. Cline*, 177 W. Va. 29, 34 n.8, 350 S.E.2d 541, 545 n.8 (1986) (balancing of private and public interests is not required unless there is an "unreasonable invasion of privacy," which means a "substantial" invasion of privacy), but out of an abundance of caution, we will consider the other four *Cline* factors, which, on balance, provide additional support for our holding. *See Charleston Gazette v. Smithers*, 232 W. Va. 449, 465, 752 S.E.2d 603, 619 (2013) (reviewing the other four *Cline* factors after concluding that the official conduct of state police officers in performing their public duties did not fall within the invasion of privacy exemption).

## B. Public Interest

The second Cline factor, the public interest in disclosure, weighs heavily in favor of disclosure in this case.[15] In evaluating the public interest factor, we use a two-part

---

[15] The Department argues that there is no public interest in disclosing the final version of the termination letter but that even if a public interest did exist, the evidence of such interest would have to clearly and convincingly outweigh Mr. Samples's privacy

test. As the court explained in *Charleston Gazette v. Smithers*, *id*. at 465, 752 S.E.2d at 619:

> We now "look [ ] for the extent or value of the public interest, purpose or object of the individuals seeking disclosure." *Cline,* 177 W.Va. at 33, 350 S.E.2d at 544. The Court again uses a twofold test: we first evaluate "the value of the public interest. The interest may be pecuniary, or the public may have an interest because their legal rights or liabilities are affected. It does not mean anything so narrow as mere curiosity." *Id.* The second test "concerns the purpose for which the information is sought. If the information is sought to provide for something which would be useful to the public, then the courts will weigh this favorably. To the contrary, where a misuse of information may result, the courts are wary of ordering disclosure." *Id.* (citations omitted).

Turning to the first part of this test, we note that "[t]he public interest which has received the greatest protection is the interest in honest and efficient government." *Child Prot. Grp. v. Cline*, 177 W. Va. 29, 33 n. 3, 350 S.E.2d 541, 544 n.3 (1986). Thus, the public has a strong interest in knowing how public employees are performing their jobs, *Sullivan v. V.A.*, 617 F. Supp. 258, 260-61 (D.D.C. 1985), especially where high-ranking officials are involved. *See Stern v. FBI*, 737 F.2d 84, 92 (D.C. Cir. 1984) (the level of responsibility held by an employee is an appropriate consideration in determining the extent of the public's interest); *Hardy v. DOD*, 2001 WL 34354945, at \*9; *see generally Cowdery, Ecker & Murphy, LLC v. U.S. Dept. of Interior*, 511 Supp.2d at 219 ("it is individual employees, particularly high-ranking employees…, whose conduct constitutes

---

interest. This clear and convincing standard does not apply unless there is an unreasonable, i.e., substantial, invasion of privacy which we have found is not present in this case.

20

government activity") . In this case, the public official held the second highest rank in the Department, the largest agency of state government in West Virginia, charged with administering a wide array of government programs affecting the lives of countless citizens of the state.

The sheer size and scope of the Department and the range of programs it administered are relevant to the weight of the public interest in its administration. *See Los Angeles Unified Sch. Dist. v. Superior Ct. of Los Angeles Cnty.*, 228 Cal. App. 4th 222, 242 (2014) (cleaned up) ("While, as a threshold matter, the records sought must pertain to the conduct of the people's business, the weight of that interest is proportionate to the gravity of the governmental tasks sought to be illuminated…"). In this case, the Department employed more than five thousand full time workers and administered more than seven and a half billion dollars of state and federal funds involving a myriad of important public services. Among other programs, the Department administered SNAP, Medicaid, WIC, WVCHIP, Family Planning, Child Support Enforcement, childcare subsidy, substance abuse programs, and Low-Income Energy Assistance. As counsel for the Department acknowledged at the circuit court hearing on March 9, 2023, the Department "touche[d] the lives [of] of almost every West Virginia[n]…we deal with every subject coming and going." Tr. 44; App. 316.[16] In his public statements, Governor Jim Justice also recognized the importance of the Department and its effect on the citizens of this state. *See* Office of

---

[16] After this hearing, the Legislature divided the Department into three smaller departments, Health, Human Services, and Health Facilities, effective January 1, 2024.

the Governor, *Gov. Justice Vetoes Bill Splitting DHHR, Additional Bills*, 3/30/22 press release; App. at 104 (noting that the Department was "an enormous agency that affects the lives of our most vulnerable West Virginians"). In its order denying a permanent restraint, the circuit court recognized that the subject matter of the draft letter involved "a matter of public significance," and "a matter of public concern," and denied the Department's request for a stay pending appeal.

As for the second part of the test, "the purpose for which the information is sought," reporting important news to the public on the operations of government lies at the heart of FOIA. As the Supreme Court of Appeals of West Virginia has emphasized, the "dissemination of public information by the press is an important cornerstone of a vivacious democracy." *Smithers*, 232 W. Va. at 466, 752 S.E.2d at 620. The news media thus plays a "vital role" in carrying out the goals of the FOIA, *id.*, and its efforts to do so here weigh in favor of disclosure. In this case, the circuit court erred in failing to give *any* weight to the public interest, let alone a weight commensurate with the importance of that interest.

## C. Availability From Other Sources

The Department argues that WSAZ might have been able to obtain a copy of the final version of the termination letter, or to obtain an authorization from Mr. Samples for the Department to release the final version. WSAZ argues that it would not be able to compel Mr. Samples to produce the letter, and even if Mr. Samples were willing to provide

22

a copy of the final termination letter, it would still want the Department to confirm the authenticity of such a copy by producing the letter itself. The record on appeal does not indicate that either party made any effort to obtain a copy of the letter from Mr. Samples or his permission for the Department to release the final draft.[17] Nor is there any indication that the final version of the termination letter could be obtained from anyone other than the Department or Mr. Samples. In fact, the circuit court expressly found that the Department and Mr. Samples were the only sources from which the letter could be obtained.

## D. Expectation of Confidentiality

WSAZ argues that, despite bearing the burden of establishing an exemption, the Department provided no evidence that there was an expectation of privacy in the letter. It also notes that on at least one prior occasion, the Department voluntarily produced information concerning the resignation of another high ranking official in the Department. Although acknowledging that FOIA issues are addressed on a case-by-case basis, and that the Department's decision to provide information in another case does not necessarily require it to do so here, WSAZ asserts that the previous disclosure should have put employees on notice that their personnel files might be disclosed. In support of its position, the Department cites an affidavit given by its general counsel, but that affidavit states

---

[17] In fact, counsel for the Department indicated during the December 14, 2022, hearing that the Department made no effort to contact Mr. Samples to obtain his authorization to release the letter. Tr. 38; App. at 178. During the same hearing, the circuit court said that it might ask the special commissioner to reach out to Mr. Samples, *id*., but the record does not indicate whether Mr. Samples was ever contacted.

23

nothing about anyone's expectations of confidentiality, the number of people involved in the termination or otherwise aware of the reasons for termination, or what actions were, or might have been, taken to ensure confidentiality.

On this issue, the circuit court relied on state regulations stating that personnel records are confidential, *see* W. Va. Code R. § 143-1-19 and -20 (2022),[18] but such regulations, although relevant under a *Cline* analysis, do not trump the statutory requirements of FOIA. *See Child Prot. Group v. Cline*, *id.* at 33 n. 5, 350 S.E.2d. at 545 n. 5 ("An agreement or expectation of confidentiality, while a factor, will not override the Freedom of Information Act."); Syl. Pt. 10, *Charleston Gazette v. Smithers*, 232 W. Va. 449, 752 S.E.2d 603 (2013) (involving requested disclosure of state police records concerning internal review of complaints of officer misconduct and investigations of officers with three or more use-of-force incidents within a three-month period); *Daily Gazette Co., Inc. v. Comm. On Legal Ethics of the W. Va. State Bar*, 174 W. Va. 359, 326 S.E.2d 705 (1984) (dealing with release of information concerning investigation of attorney misconduct); *Daily Gazette Co., Inc. v. W. Va. Bd. of Med.*, 177 W. Va. 316, 352 S.E.2d 66 (1986) (FOIA request for disciplinary files relating to professional malpractice or

---

[18] West Virginia Code R. § 143-1-19.1 provides in part that: "All personnel records shall be open to the inspection of the Board but shall otherwise be held confidential by each agency and the Director in accordance with Section 21 of this rule." West Virginia Code R. § 143-1-20 provides in pertinent part that: "The business of the Division of Personnel shall be conducted in such a manner as to ensure the privacy rights of all applicants and employees, in accordance with W. Va. Code § 29B-1-1 et seq., the State Freedom of Information Act and § 5A-8-1 et seq., the Public Records Management and Preservation Act."

24

incompetence of any physicians, podiatrists, or physicians' assistants licensed by West Virginia Board of Medicine).

Although the legislative rule concerning confidentiality is a factor to consider under *Cline,* it "is not dispositive of the issue, and the FOIA shall remain the proper analytical framework for issues of disclosure of public information." *Charleston Gazette v. Smithers*, 232 W. Va. at 468, 752 S.E.2d at 622. Holding that the existence of a confidentiality regulation is not dispositive seems particularly appropriate where the confidentiality regulation expressly provides that the privacy rights of employees must be protected "in accordance with … the State Freedom of Information Act[.]" West Virginia Code R. § 143-1-20. The Department recognizes that this regulation is not dispositive of whether the termination letter should be disclosed. We conclude that this factor weighs in favor of non-disclosure but is greatly outweighed by the public interest in disclosure.

### E. Ability to Mould Relief

"Trial courts should be encouraged to take innovative measures to limit the invasion of individual privacy whenever disclosure is required." *Child Prot. Grp. v. Cline, id.* at 33, 350 S.E.2d at 545. In this case, however, the parties agree that it would not be possible to mould relief in such a way as to limit the Department's invasion of privacy concerns. The letter cannot be redacted because the allegedly public information and the allegedly private information are the same, i.e., the reasons for termination stated in the termination letter. Nor can disclosure be limited to a small number of distributees with a

"need to know," as was done in *Child Protection Group v. Cline*, because the operation of the Department potentially affects everyone in the state given the size and range of the programs it administers.

## IV. CONCLUSION

Although the termination letter at issue does involve some minimal privacy concerns, after weighing all the relevant factors, we conclude that public disclosure does not constitute an unreasonable invasion of privacy and is therefore required by FOIA. Accordingly, we reverse and remand this matter for further proceedings consistent with this opinion. Specifically, the circuit court should direct the Department to release the final version of the termination letter to WSAZ and hold a hearing on WSAZ's request for related attorney fees and costs.

Reversed and Remanded.